**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>    c/o United States Attorney's Office<br>    Judiciary Center Building<br>    555 Fourth St., N.W.<br>    Washington, D.C.  20530<br><br>                    **Plaintiff,**<br><br>    v.<br><br>**REAL PROPERTY LOCATED AT**<br>**7 BUCKINGHAM COURT**<br>**HOUSTON, TEXAS  77024;**<br><br>**REAL PROPERTY LOCATED AT**<br>**13601 FARM TO MARKET 529,**<br>**HOUSTON, TEXAS  77041;**<br><br>                    **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)          **Civil Action No.:**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**VERIFIED COMPLAINT FOR CIVIL FORFEITURE ACTION IN REM**

Plaintiff, United States of America, by and through its attorney, the United States Attorney for the District of Columbia, brings this Verified Complaint for Forfeiture against the real properties located at 7 Buckingham Court, Houston, Texas, and at 13601 Farm To Market 529, Houston, Texas, and alleges as follows in accordance with Supplemental Rule for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rule") G(2):

### I.     NATURE OF THE ACTION

1.     This is a civil forfeiture action *in rem* to forfeit all right, title, and interest in the defendant properties, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A).

## II. THE DEFENDANT PROPERTIES

2. The first defendant property is the real property located at 7 Buckingham Court, Houston, Texas, with all appurtenances, improvements, and attachments thereon, and is more fully described as: Lot 7, of Buckingham Court, a subdivision in Harris County, Texas, according to the map and plat thereof, recorded in Film Code No. 347064 of the map records of Harris County, Texas (hereinafter "Defendant Property 1").

3. The second defendant property is the real property located at 13601 Farm To Market 529, Houston, Texas, with all appurtenances, improvements, and attachments thereon, and is more fully described as – a tract of land containing 2.5727 acres of land (112,067 sq.ft.) out of the Charles Scarbrough survey, Abstract No. 718, being a portion of a 4.000 acre tract of land as recorded under Harris County Clerk's file No. (CCFN) 20100135228 of the official public records of Harris County, Texas (hereinafter "Defendant Property 2").

## III. JUDICIAL AUTHORIZATION AND PROCESS

4. Under Supplemental Rule G(3)(a), the United States must comply with the procedures in 18 U.S.C. § 985 when initiating civil forfeiture actions against real property.

5. The defendant properties have not been seized. The United States does not seek authority under 18 U.S.C. § 985(d)(1) to seize the defendant properties prior to trial. In accordance with 18 U.S.C. § 985(b)(1)(A), the defendant properties will not be seized until the entry of a forfeiture order.

6. Upon filing of this Complaint, the United States will:

    a. Post notice of this Complaint on the defendant properties as required by 18 U.S.C. § 985(c)(1)(B);

    b. Serve notice of this action and a copy of this Complaint on Shan SHI, his wife,

Lei Jiang, and CBM International, Inc. ("CBMI"), the purported property owners, as required by 18 U.S.C. § 985(c)(1)(C);

c. Send notice of this action and a copy of this Complaint to any person who reasonably appears to be a potential claimant as required by Supplemental Rule G(4)(b); and

d. Publish notice of this action pursuant to the procedures in Supplemental Rule G(4)(a).

## IV. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1345, as this is a civil action commenced by the United States; and pursuant to 28 U.S.C. § 1355(a), as this is an action or proceeding for the recovery or enforcement of a forfeiture.

8. This Court has *in rem* jurisdiction pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred within the District of Columbia; and pursuant to 28 U.S.C. § 1355(b)(1)(B), which provides for *in rem* jurisdiction in any district where venue is proper under 28 U.S.C. § 1395.

## V. BASIS FOR FORFEITURE

9. As explained more fully below, from March 2012 through May 2017, in the District of Columbia and elsewhere, the co-conspirators conspired to steal, possess, transmit, and receive trade secrets from a global engineering company, ("Company A") in order to convert those trade secrets to their own economic benefit in violation of 18 U.S.C. § 1832(a)(5) (Conspiracy to Commit Theft of Trade Secrets).

10. Once CBMI employees had successfully stolen and transmitted Company A's trade secrets, CBMI was compensated with and sustained by monetary transactions in the form of international transfers of funds from The People's Republic of China ("China") to CBMI's United

States bank account. These transfers of funds were intended to promote the continued success of the above conspiracy in violation of 18 U.S.C. § 1956(a)(2)(A) (Engaging in International Monetary Transactions Designed to Promote a Specified Unlawful Activity) and to compensate the employees of CBMI for the successful theft of trade secrets in violation of 18 U.S.C. § 1832(a)(5). SHI then used the laundered funds made available to CBMI through the conspiracy's theft of trade secrets to purchase the defendant properties and to make recurring payments on debt associated with the second defendant property.

11. Based on the facts set forth in this Complaint, there is a reasonable belief that the defendant properties are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as real properties, which constitute or are derived from proceeds traceable to the theft of trade secrets. There is also a reasonable belief that the defendant properties are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A), as real properties involved in, and traceable to transactions in violation of 18 U.S.C. § 1956.

### A. Terms and Definitions

12. <u>Syntactic foam</u> - is a composite material consisting of tiny hollow microspheres suspended in an epoxy resin. The combination of hollow spheres encased in epoxy creates a strong, light material ideal for a variety of applications. Strength and other performance characteristics can be improved by chemical surface treatment of the microspheres. Syntactic foam may be tailored for both commercial (oil exploration, etc.) and military use (including aerospace, underwater vehicles, and stealth technology).

13. <u>Trade Secret</u> – is a form and/or type of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes,

whether tangible or intangible, and whether or how stored, compiled, memorialized physically, electronically, graphically, photographically, or in writing if (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. See 18 U.S.C. 1839(3).

**B.     Individuals and Associated Entities**

14.     Longkui QU is a Chinese national who lives in China. QU is the President of Taizhou CBM Future New Material Science and Technology Co. Ltd. ("CBMF").

15.     CBMF is a company that manufactures syntactic foam (and other related materials) and is located in Zhejiang Province, China. QU, with others, established CBMF in May 2012 to facilitate China's national goals of developing its marine engineering industry, specifically to facilitate and increase innovative research and domestic manufacturing of syntactic foam.

16.     CBMI was established in March 2014 in the United States. Incorporation records reveal that CBMF is the only shareholder for CBMI. CBMI has received over $3.1 million dollars in wire transfers from CBMF to fund CBMI's operations. The CBMI business plan stated that CBMI intended to concentrate on research and development ("R&D") of new buoyancy material. The plan also stated that the buoyancy material market was a $2 billion dollar industry, dominated by four companies, and that CBMI intended to be the fifth. According to internal documents, CBMF received more than half of its funding from China in 2014. As of May 2015, at the height of the conspiracy, CBMI described itself in a business plan as "totally financially supported" by CBMF.

17.     Shan SHI is the President of CBMI. According to CBMI's incorporation document,

SHI, QU, and another Chinese national are the three directors of CBMI.

18. In September 2000, prior to the inception of the above conspiracy, SHI and two other directors incorporated Optimax International, Inc. as a for-profit corporation in Houston, Texas. As President, SHI later changed the company's name to Offshore Dynamics, Inc. (ODI). ODI provides engineering consulting services to the oil and gas industry. According to information obtained during the course of the investigation, SHI controls ODI. This assessment is corroborated by records maintained by the Texas Secretary of State showing that SHI was the only manager, member, or director of ODI on each of the company's annual Public Information Reports filed with the state.

19. Kui BO is a current employee of CBMI. At CBMI, Bo is involved in day-to-day operations.

20. Samuel OGOE was employed at CBMI until late 2015, when he became a contract employee. Previously, OGOE was employed by Company A as a Materials Development Manager where he had access to proprietary and trade secret data.

21. Johnny Wayne RANDALL was employed as a Production Supervisor by Company A, where he had access to proprietary data and trade secret data.

22. Uka UCHE was employed by Company A, where he worked as an Operations Systems Specialist, and had access to proprietary and trade secret data.

23. Gang LIU previously worked for Company A as a Material Development Engineer, where he had access to proprietary and trade secret data. LIU is highly involved in the R&D at CBMI.

24. Hui HUANG is an employee of CBMF, and is involved in many of the interactions and taskings that CBMF sends to CBMI employees.

C.   **Facts Giving Rise to Forfeiture**

1.   Background on theft of trade secrets scheme

25. In January 2014, China's Ministry of Industry and Information Technology (MIIT) approved CBMF's R&D of high-performance, deep-water syntactic foam as a major project of marine engineering. To accomplish this goal, CBMF joined a "National Team of Marine Engineering" and a collaborative innovation center with Chinese State-Owned Enterprises ("SOEs") to carry out joint ventures in deep-sea buoyancy material, military insulation spacer material, and new lightweight composite design. Internal CBMF documents showed that CBMF intended to sell syntactic foam to both military and civilian Chinese SOEs. The project resulted in CBMF receiving 4 million Yuan (equivalent to approximately $650,000) in Chinese state funding.

26. The Chinese government and SOEs sponsored and tasked the China-based CBMF and the U.S.-based CBMI to further China's national interests in marine technology. Specifically, communications obtained in the course of the investigation establish that Chinese state-sponsored actors tasked SHI with developing syntactic foam on behalf of China through CBMI.

27. Rather than go through the laborious process of developing their own syntactic foam, CBMF aided SHI in the establishment and funding of CBMI to acquire the technical data necessary to circumvent the cost intensive R&D process. To do this, CBMI attempted to hire a former employee of Company A, an existing syntactic foam manufacturer. However, when that approach failed, CBMI stole technological data from Company A, both from then current Company A employees with access to the data, and from ex-Company A employees who continued to possess the data after their employment, in violation of their signed severance agreements. Communications then show CBMI used that data to create their own manufacturing facility, with funding provided by Chinese entities, and sent the valuable information to CBMF employees in

China with full knowledge of the value of the information and of the illicit nature of the scheme.

28.     As noted above, RANDALL, OGOE, and UCHE previously worked at Company A. The Company A Employee Guide ("Guide"), dated July 2007, was signed by RANDALL on August 9, 2007, by OGOE on June 16, 2008, and by UCHE on July 1, 2008. The Guide stated that employees would be working with "confidential proprietary information," which was important to Company A's "competitive position in the industry." Employees had to respect "all information, including confidential information, trade secrets, trademarks, trade names, patents, designs and other information utilized by or beneficial to the Company in connection with the Company's business." Employees were "expected to report any efforts by anyone to obtain or solicit information to which he or she is not entitled."

29.     According to Company A's Technology User Code, dated January 2009, disclosure or dissemination of confidential or proprietary information regarding Company A, its products or its customers, to unauthorized parties is strictly prohibited. The Code outlined requirements in order to protect the information, including individual logins for username and passwords, physical barriers such as locking file cabinets or safes, and limitations on portable media. This User Code was signed by OGOE on September 30, 2009; RANDALL on October 10, 2009; UCHE on November 25, 2009; and LIU on June 10, 2013 and February 25, 2014.

> 2.   CBMI hired OGOE, a former Company A employee, to facilitate its theft of trade secrets

30.     On or about October 17, 2014, BO sent a job description via email to an identified U.S. Person, noting CBMI was "looking for people who mainly worked or are working for Company A in Houston to help us set up a small product line for drilling buoyancy module." On or about October 24, 2014, BO emailed SHI the Curriculum Vitaes ("CV") of Company A employees that BO had found online, including the CV of OGOE. On or about October 24, 2014,

BO confirmed by email with an identified hiring agency that OGOE was an expert on drilling riser buoyancy materials. The hiring agency responded that OGOE's experience was with drill riser buoyancy materials containing syntactic foam at Company A.

31. On or about October 30, 2014, CBMI interviewed OGOE. On October 31, 2014, OGOE sent an email to BO titled "Prospective CBM International Team Member." OGOE indicated he had spoken to a friend, another identified U.S. Person, who had worked with OGOE at Company A. OGOE said the U.S. Person was the expert "Guru" in drill riser and polyurethane modules manufacturing and worked with a U.K. company before transitioning to Company A. Later the same day, BO forwarded the email to SHI. SHI responded by saying, "Good. The buoyancy world is opening to us now."

32. On or about November 13, 2014, BO sent an email to the hiring agency stating CBMI had decided to hire OGOE, and there would be no need for another interview.

33. On or about November 14, 2014, OGOE sent an email to BO thanking him for a payment of $2,000.

### 3. Example 1 of the theft of trade secret by CBMI

34. On January 13, 2015, RANDALL, who at the time was still an employee of Company A, emailed OGOE the following information. "Sam Please see attach for helpful info. Also we have 3 size test cylinders." Attached to the email were seven files. One of the attachments was an Excel spreadsheet with two tabs titled "Bead burst and density." Tab 1 included Company A's logo and name. This document's metadata listed "johnny.randall" as the author, and the company as Company A.

35. On or about January 28, 2015, OGOE emailed SHI regarding diameter, density, pressure, etc. for various types of coated spheres. The email had an attached spreadsheet titled

9

"Sphere Diameter Pressure and Density 1-27-15."

36. The metadata of the spreadsheet OGOE sent SHI showed it was authored by OGOE on June 19, 2012, while he was still a Company A employee, and last modified by OGOE on January 28, 2015. This document was identical to the one sent by RANDALL to OGOE, except that the Company A logo and one chart had been deleted.

37. A Company A official stated that the above Excel spreadsheet emailed by OGOE to SHI was a trade secret and was considered "critical" information for Company A. The Company A official explained this document was created by Company A's "technical innovation team." The Company A official stated that access to this spreadsheet would have been limited to the six team members of the technical innovation team who had access to the team's digital directory in Company A's database. The official also stated that access to Company A's computers required a complex alphanumeric password which had to contain a symbol and had to be regularly changed. OGOE was a chemical engineer and was on the technical innovation team during his time at Company A and therefore could have had access to the spreadsheet at the time it was created.

    4.     Example 2 of the theft of a trade secret by CBMI

38. On or about January 14, 2015, UCHE emailed OGOE an excel spreadsheet titled "MIDIS DENSITY 2015." UCHE forwarded the spreadsheet from his Company A email account to his personal email account prior to sending it to OGOE.

39. The document's metadata showed it was authored by an identified Company A employee on May 13, 2013, and last modified by UCHE on January 14, 2015.

40. A Company A official stated that this Excel spreadsheet, emailed by UCHE to OGOE, was a Company A trade secret. The official stated this document was a trade secret because it would give a competitor key information about the performance of a certain batch of Company

A's macrospheres. The Company A official considered this trade secret costly to develop. The official further commented there were not a lot of startups in the buoyancy industry because the technology was so slow to develop.

5. Example 3 of the theft of a trade secret by CBMI

41. Hydrostatic testing is an important component in determining the quality of manufactured spheres used in syntactic foam. On or about January 30, 2015, Company A employee UCHE sent an email from his personal email account to OGOE with the subject "Test procedure." Attached to the email was a PowerPoint titled "SOP00339-7 Hydrostatic Crush Pressure HCP Mini-Sphere.pptx," which contained a legal warning on each slide. The legal warning stated, "This document contains confidential information. All rights (including copyright, confidential information trade secrets and design rights) are owned by [Company A]. No use or disclosure is to be made without prior written permission of [Company A]. All rights reserved." The PowerPoint's metadata showed it was authored by two Company A employees on February 23, 2011 and was last modified on January 16, 2015.

42. A Company A official stated that the above PowerPoint presentation emailed by UCHE to OGOE, was a trade secret. The Company A official considered this trade secret costly to develop.

43. On or about March 20, 2015, OGOE emailed SHI, BO, and another CBMI employee. The email had two attachments, including a Word document titled "Hydrostatic Burst Pressure Test Procedure," and a spreadsheet titled "Sam-10 mm Carbon Density 3-20-15." The document contained a summarized version of the contents of the above referenced PowerPoint that UCHE sent to OGOE on January 30, 2015.

### 6. CBMI hired LIU, a former Company A employee, to facilitate its theft of trade secrets

44. On or about April 10, 2015, SHI sent an email to his deepoil.com account. The email contained a forward of a message from LIU to SHI. In the original message, LIU introduced himself and explained a friend referred him to SHI. The email contained LIU's resume, which outlined LIU's employment at Company A.

45. On or about April 12, 2015, SHI, from his deepoil.com account, emailed LIU to offer a full time job at ODI. LIU accepted the offer on the same day, and started working at ODI on April 13, 2015.

46. On or about June 20, 2016, CBMI's accountant was instructed to "stop Gang LIU's ODI payroll from June 1 [2016]" because he was transferred to CBMI's system. The investigation revealed that SHI placed LIU at ODI for one year, at least in part in order to avoid any unwanted attention to LIU's work for CBMI prior to February 2016, including avoiding the issue of Liu's non-compete provision with Company A.

### 7. Example 4 of the theft of a trade secret by CBMI

47. On or about April 15, 2015, during his first week at work at ODI, LIU emailed SHI a macrosphere process model spreadsheet. Within the spreadsheet was a tab labeled "Reference-[Company A]." The document's metadata showed it was created on September 15, 2006 and last modified on April 15, 2015. Despite LIU's employment by ODI at this time, LIU was actually working on CBMI projects in violation of his Non-Compete Agreement with Company A, and was using proprietary information taken from the Company A.

48. A Company A official stated the above Excel spreadsheet was a trade secret.

### 8. Example 5 of the theft of a trade secret by CBMI

49. On or about May 8, 2015, LIU emailed SHI, BO, and HUANG a spreadsheet titled

"Macrosphere Rating & Cost." Within the spreadsheet was a tab labeled "Reference-[Company A]." The document's metadata showed that it was created on September 15, 2006 and last modified on May 8, 2015.

50. A Company A official stated the above Excel spreadsheet was a trade secret.

### 9. Example 6 of the theft of a trade secret by CBMI

51. On or about April 17, 2015, LIU emailed SHI a theoretically calculated syntactic foam formulation.

52. A Company A official explained this foam formulation data was proprietary and a trade secret.

53. On or about June 4, 2015, LIU emailed HUANG, stating, "The attachment provides technical data of the raw materials and prices of part of the raw material received by [Company A] for your reference." Attached to the email were datasheets and one spreadsheet with a tab labeled "Reference-[Company A]."

54. A Company A official stated that the above spreadsheet was a trade secret.

### 10. CBMI's most recent theft of trade secrets

55. During a series of communications in or about April 2017, BO and SHI were advised of an opportunity to bid on a contract for the next generation of commercial Remote Operated Vehicles (ROV). The ROVs utilize low density syntactic foam technology. On May 17, 2017, CBMI learned that it was selected as a finalist, and that it was invited to present its bid at a meeting in Washington, D.C.

56. On May 23, 2017, in the District of Columbia, SHI, LIU, and another person provided a presentation of CBMI and CBMF's capabilities. This presentation was in furtherance of the conspiracy to convert Company A's trade secrets to their economic benefit. During the

course of that presentation, SHI boasted about the quality of CBMI's spheres, claiming that CBMI "redesigned" spheres to make them "two levels better."

57. Also during the May 23, 2017, meeting, LIU contended that CBMI's spheres are "customizable beyond 4,000 meters." SHI agreed, adding that such spheres "cannot be exported to China."

          11.     CBMI's theft of trade secrets was for the benefit of CBMF in China

58. During a dinner conversation on December 8, 2016, SHI said, "In all aspects, China has no own innovations; that's why theirs are much cheaper. They save lots on research money because it will be so costly in the beginning. The first model will cost so much. Just to take a look at it, China will understand it immediately and will not do research by themselves. The U.S., for example, is like a locomotive, driving its own train, selling tickets and showing others around. China will either pay to ride in that train or drive its own train."

59. The above trade secrets were sent from the United States to China by CBMI employees. These trade secrets were protected by Company A's agreements with its employees and its security of its campuses and computer networks. According to Company A, the data had value as a result of R&D costs and was valuable information that Company A wanted to protect while operating in a competitive market.

60. As a result, the communications to CBMI, and the subsequent communications to CBMF containing Company A's stolen data concerning syntactic foam constitutes violations of U.S. law, namely the Theft of Trade Secrets.

          12.     Laundering of funds to promote the theft of trade secrets by CBMI

61. On May 6, 2014, SHI, QU, and another Chinese national opened bank accounts at Bank of America ending in 6528 and 3050, both in the name of CBMI. According to both signature

cards, SHI is the President of CBMI and QU is a Vice President of CBMI.

62. On February 13, 2015, SHI and BO opened a bank account at Bank of America ending in 4818 in the name of CBMI. According to the signature card, SHI is the President of CBMI and BO is a Vice President of CBMI.

63. Beginning on June 27, 2014, and continuing through at least May 18, 2017, employees of CBMF conspired to send approximately 35 wire transfers to CBMI totaling approximately $3.1 million dollars. CBMF sent these wire transfers from its account at the Bank of China to CBMI's U.S.-based account at Bank of America, ending in 6528.

64. CBMF sent these funds to promote CBMI's carrying on of a specified unlawful activity, namely theft of trade secrets. Specifically, these transfers furthered the purchase of CBMI's U.S. manufacturing and testing facility and related equipment. The vast majority of CBMI's operational budget came from these wire transfers from CBMF.

65. Upon the receipt of funds to CBMI's Bank of America account ending in 6528, the co-conspirators would frequently rapidly transfer these funds to CBMI's other Bank of America accounts ending in 3050 and 4818. This rapid movement of funds between accounts is consistent with the practice of layering.

**D.  Tracing of Defendant Properties**

    1.  <u>Defendant Property 1 was purchased with laundered funds</u>

66. On August 12, 2014, CBMI's United States based Bank of America account number ending in 6528 received an international wire transfer in the amount of $120,000.00 from CBMF's bank account at Bank of China in China. These funds were involved in, and traceable to, the above described conspiracy to steal trade secrets.

67. On August 14, 2014, SHI purchased a cashier's check in the amount of $120,000.00

drawn directly from CBMI's account ending in 6528. This cashier's check was purchased from the same CBMI bank account and in the same amount as the above-listed wire transfer from CBMF.

68. On August 15, 2014, SHI, as President of ODI, purchased Defendant Property 1 in the name of ODI. SHI signed the closing documents as the buyer's representative. SHI remitted the $120,000.00 cashier's check as part of the purchase of Defendant Property 1.

69. On October 27, 2014, SHI, as President of ODI, conveyed the title to Defendant Property 1 to himself and his wife, Lei Jang, via a General Warranty Deed filed with the Harris County Clerk, No. 20140487006. At the time of the transfer of title there were no outstanding liens against Defendant Property 1.

### 2. Defendant Property 2 was purchased with laundered funds

70. In August 2015, the CBMI Bank of America account ending 6528 initiated two online transfers of funds totaling $23,000.00 to the CBMI Bank of America account ending 4818. Using these funds, SHI then wrote check number 1061, drawn on CBMI's 4818 account, to a title company for $10,000.00 as an earnest money deposit in furtherance of the purchase of Defendant Property 2. Based on the activity of CBMI's 4818 account between the date of the incoming transfers and the date the outgoing check, the only funds remaining in CBMI's account ending in 4818 were those provided by CBMI's account ending in 6528. As shown above, CBMI's Bank of America account ending in 6528 was comprised of funds traceable to, and involved in the conspiracy to steal trade secrets.

71. On November 27, 2015, $20,000 was transferred from CBMI's account ending in 6528 to CBMI's account ending in 4818. This drew the balance in CBMI's account ending in 6528 to an amount under $15,000. On December 4, 2015, CBMI's 6528 account received an

international wire transfer from CBMF in the amount of $350,000. There were no other transactions into or out of CBMI's 6528 account between November 13, 2015, and December 8, 2015.

72.   On December 9, 2015, SHI purchased a cashier's check in the amount of $210,355.44 drawn directly from CBMI's account ending in 6528. SHI then remitted the cashier's check to the title company as part of the purchase of Defendant Property 2. The investigation has revealed that CBMI purchased this property, in part, as a site for a manufacturing and testing facility.

73.   SHI subsequently caused regular mortgage payments to be made from CBMI's account ending in 3050, which has been funded by CBMI's account ending in 6528, which in turn has been funded by CBMF.

74.   The total known payments toward Defendant Property 2 are as follows:

| Funding Source | Amount | Form of Payment |
|---|---|---|
| CBMI Bank Acct. 4818 | $ 10,000.00 | Check # 1061, as seen above. |
| CBMI Bank Acct. 6528 | $ 210,355.44 | Cashier's Check, as seen above |
| CBMI Bank Acct. 3050 | $ 3,818.47 | February 2016 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | March 2016 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | April 2016 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | May 2016 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | June 2016 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | July 2016 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | August 2016 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | September 2016 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | October 2016 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | November 2016 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | December 2016 automated draft |

| CBMI Bank Acct. 3050 | $ 3,818.47 | January 2017 automated draft |
|---|---|---|
| CBMI Bank Acct. 3050 | $ 3,818.47 | February 2017 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | March 2017 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | April 2017 automated draft |
| CBMI Bank Acct. 3050 | $ 3,818.47 | May 2017 automated draft |
| CBMI Bank Accounts | $ 281,450.96 | Payments Made Toward Defendant Property 2 |

## VI. COUNTS

### Count One
### (18 U.S.C. § 981(a)(1)(C))

75. Each of the foregoing allegations is hereby incorporated by reference as if fully set forth herein.

76. CBMI, CBMF, SHI, BO, QU, and others known and unknown acted individually and conspired together to steal the above identified trade secrets, in violation of 18 U.S.C. § 1832.

77. As such, the defendant properties are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as properties which constitutes or are derived from proceeds traceable to a conspiracy to steal trade secrets.

### Count Two
### (18 U.S.C. § 981(a)(1)(A))

78. Each of the foregoing allegations is hereby incorporated by reference as if fully set forth herein.

79. CBMI, CBMF, SHI, BO, QU, and others known and unknown acted individually and conspired together to transmit and transfer at least $3,100,000 to a place inside the United States from or through a place outside the United States, with the intent to promote the carrying on of violations of the conspiracy to steal trade secrets, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A). Furthermore, SHI and others known and unknown, acted individually and

conspired together to transfer the above identified laundered funds to purchase the defendant properties.

80.  As such, the defendant properties are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A), or as any property traceable to such property.

## VII.  CONCLUSION

**WHEREFORE**, the United States prays that this Court decree that all right, title, and interest in the defendant properties be condemned and forfeited to the United States of America, and for such other and further relief as the Court deems just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

CHANNING D. PHILLIPS,
United States Attorney
for the District of Columbia


 /s/ *Zia Faruqui*
Zia Faruqui, D.C. Bar Number 494990
Jeff Pearlman, D.C. Bar Number 466901
Assistant United States Attorney
555 Fourth Street, N.W.,
Washington, D.C. 20530
(202) 252-7117 (Faruqui)
(202) 252-7228 (Pearlman)
zia.faruqui@usdoj.gov
jeffrey.pearlman@usdoj.gov

## **VERIFICATION**

I, Andrew Ingram, a Special Agent with the Internal Revenue Service's Criminal Investigation Division, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture In Rem is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 23rd day of May, 2016.


    /s/ Andrew Ingram
Special Agent Andrew Ingram
Internal Revenue Service - Criminal Investigation